**EMPLOYERS INSURANCE OF WAU-SAU, Plaintiff, Counterclaim Defendant-Appellee,**

v.

**PETROLEUM SPECIALTIES, INC., Defendant, Counterclaim Plaintiff, Third Party Plaintiff-Appellant,**

**Zurich Insurance Company, Third-Party Defendant–Appellee.**

No. 92–1629.

United States Court of Appeals, Sixth Circuit.

Argued May 6, 1993.

Decided Nov. 1, 1995.

James R. Case, Kerr, Russell & Weber, Detroit, MI, Patricia St. Peter (argued and briefed), and Brian L. Ripperger, Zelle & Larson, Minneapolis, MN, for Employers Insurance of Wausau.

John Dudley, Jr. (briefed), and Jack D. Shumate (argued), Butzel, Long, Gust, Klein & Van Zile, Detroit, MI, for Petroleum Specialties, Incorporated.

Peter B. Kupelian (briefed), Kupelian, Ormond & Magy, Southfield, MI, for Zurich Insurance Company.

Thomas W. Brunner (briefed), Nancy J. Lemay, Wiley, Rein & Fielding, Washington, DC, and Marilyn E. Kerst, Washington, DC, for Movant–Amicus Curiae.

Before: MARTIN, KRUPANSKY, and BOGGS, Circuit Judges.

BOGGS, Circuit Judge.

Petroleum Specialties, Inc. ("PSI") appeals a grant of summary judgment in this declaratory judgment action in favor of Employers Insurance of Wausau and Zurich Insurance. The parties disagree as to the scope of coverage afforded PSI for certain pollution remediation costs and damages under various insurance policies issued by Wausau and Zurich. For the reasons set out below, we reverse.

## I

PSI owns 60 acres of real property in Flat Rock, Michigan. PSI operated an oil refinery there from the early 1930s until approximately 1964. Since 1964, PSI has used the land as a petroleum storage facility. Consistent with its use for petroleum distillation and storage, the property contains an abandoned oil refinery, furnaces and other associated equipment, as well as approximately 38 bulk storage tanks with a capacity in excess of 17 million gallons. It appears indisputable that the property is now heavily contaminated with various pollutants.

The condition of the property came to light, at least for the purposes of this suit, on June 15, 1989, when staff members of the Michigan Department of Natural Resources (MDNR) conducted a site evaluation. Over the next few months, visits by various MDNR personnel led to the discovery of, among other things: a large, open lagoon of petroleum; soil contaminated with PCBs, lead, arsenic, cyanide, and benzene; asbestos construction material; leaking electrical transformers; and leaking drums containing xylene, toluene, and lead.

Matters reached a head when, on January 8, 1991, the MDNR issued a "Potentially Responsible Party (PRP)" letter to PSI. This letter identified PSI as a party potentially responsible for the pollution and directed PSI to investigate and take corrective action. When PSI did not satisfy the demands of the MDNR, the agency issued, on July 28, 1991, an Administrative Order for Response Activity, incorporating a specific remediation plan. When PSI failed to follow the dictates of the

Administrative Order, the MDNR filed suit in Michigan state court on November 7, 1991.

Concurrent with these events, PSI had begun a futile effort to secure defense and indemnification from its insurers. Wausau, realizing its potential liability to defend and possibly indemnify PSI, brought a declaratory judgment action on August 20, 1991. Wausau sought a determination that it had no duty to defend or indemnify PSI in any matter related to the remediation of the pollution at the Flat Rock site. On October 2, 1991, PSI filed a counterclaim and joined Zurich as a third-party defendant.

Both Zurich and Wausau have written insurance policies covering PSI. Zurich covered PSI for anything caused by an "accident" from 1951 to 1956. Specifically, Zurich promised to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by an accident." The policy limited its coverage "to accidents which occur during the policy period." The policy contained no pollution exclusion.

Wausau provided insurance to PSI from July 16, 1956 to August 1, 1985. The policies effective from July 16, 1956 until August 1, 1967 provided that Wausau would pay "on behalf of the insured all sums which the insured shall become obligated to pay by reason of liability imposed upon him . . . because of injury to or destruction of property . . . *caused by accident.*" (emphasis added). The policies in effect from August 1, 1967 until August 1, 1985 stated that Wausau would "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . property damage . . . caused *by an occurrence* . . . ." (emphasis added). All of the Wausau policies provided that they afforded coverage only for accidents or occurrences that took place during the policy period.

From August 1, 1970 until August 1, 1985, each Wausau policy contained a pollution exclusion that precluded coverage for any property damage caused by pollution unless the property damage arose out of a sudden and accidental discharge. Specifically the policy provided that:

> It is agreed that the insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release, or escape is sudden and accidental.

According to the terms of the policy, Wausau would have a duty to defend PSI as well as indemnify it. In particular, the policy states that Wausau has "the right and duty to defend any suit against the insured seeking damages on account of . . . property damage . . . to which this insurance applies. . . ."

On March 2, 1992, having completed at least some discovery, PSI moved for partial summary judgment on the duty to defend issue. Both Wausau and Zurich filed briefs opposing the motion. Furthermore, Zurich, but not Wausau, also made a cross-motion for summary judgment, seeking summary judgment on both the duty to defend and the duty to indemnify issues. After hearing oral argument, the district court entered a judgment on April 24, 1992 that denied PSI's motion for partial summary judgment and granted Zurich's motion for summary judgement. The court also entered, *sua sponte,* summary judgment for Wausau.

**II**

■ This court reviews *de novo* the district court's grant of Appellees' motion for summary judgment. *Baggs v. Eagle–Picher Indus., Inc.,* 957 F.2d 268, 271 (6th Cir.), cert. denied, —— U.S. ——, 113 S.Ct. 466, 121 L.Ed.2d 374 (1992). This court must affirm the district court only if it determines that the pleadings, affidavits, and other submissions show "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When evaluating this appeal, this court must view the evidence in the light most favorable to the non-moving

party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

■■■ The moving party need not support its motion with evidence disproving the non-moving party's claim, but need only " 'show[ ]'—that is, point[ ] out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). The pivotal question is whether the party bearing the burden of proof has presented a jury question as to each element of its case. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present "evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir. 1992) (*quoting Gregg v. Allen–Bradley Co.,* 801 F.2d 859, 863 (6th Cir.1986)).

■■■ All parties agree that we apply Michigan law in this diversity action. The Michigan Supreme Court has held that exclusion clauses in insurance policies are to be strictly construed against the insurer and that ambiguous contract provisions also must be construed against the insurer and in favor of the insured. *Farm Bureau Mut. Ins. Co. v. Stark,* 437 Mich. 175, 468 N.W.2d 498, 501 (1991). Furthermore, the duty to defend is broader than the duty to indemnify. *Stockdale v. Jamison,* 416 Mich. 217, 330 N.W.2d 389 (1982). In fact, the insurer must defend a lawsuit even if there are theories of liability that the policy does not cover, so long as there are theories of recovery that fall within the policy's scope. *Dochod v. Central Mut. Ins. Co.,* 81 Mich.App. 63, 264 N.W.2d 122 (Mich.Ct.App.1978). *See Detroit Edison Co. v. Michigan Mut. Ins. Co.,* 102 Mich.App. 136, 301 N.W.2d 832, 835 (1980) (insurer has a duty to defend so long as the allegations "even arguably come within the policy coverage."). *See also Oscar W. Larson Co. v. United Capitol Ins. Co.,* 64 F.3d 1010 (6th Cir.1995). However, the "duty to defend is

not an unlimited one." *Meridian Mut. Ins. Co. v. Hunt,* 168 Mich.App. 672, 425 N.W.2d 111 (1988).

■■■ Furthermore, we have held that where the coverage is subject to a pollution exclusion clause, as is the case here under the Wausau policies in effect from 1975 to 1985, the burden is on the insured to demonstrate that the accidents were sudden and accidental, since the presumption is that there is no duty to provide coverage of any sort. *Harrow Prods., Inc. v. Liberty Mut. Ins. Co.,* 64 F.3d 1015, 1020 (6th Cir.1995) ("When a policyholder seeks to invoke the 'sudden and accidental' clause, the policyholder 'ha[s] the burden of proof, both the burden of producing evidence and the burden of persuasion, as to whether the "sudden and accidental" exception to the pollution exclusion applies.' ")(quoting *Fireman's Fund Ins. Cos., v. Ex–Cell–O Corp.,* 702 F.Supp. 1317, 1329 (E.D.Mich.1988)).

### III

■■■ PSI claims that the district court improperly granted summary judgment in favor of Zurich. Unlike PSI, which only moved for partial summary judgment based on the duty to defend issue, Zurich sought summary judgment on both the issue of its duty to defend and its duty to indemnify. The district court wrongly granted Zurich's motion.

Zurich asserts that there is no evidence that an accident, resulting in a spill, took place during the years of coverage. Like Wausau, it relies solely on the MDNR complaint. Zurich's approach is flawed for two reasons.

■■■ First, there is no requirement that the court look only at the complaint and no further to determine whether there is a duty to defend. Michigan courts have repeatedly held that "[t]he duty to defend cannot be limited by the precise language of the pleadings. The insurer has a duty to look behind the third party's allegations to analyze whether coverage is possible." *Detroit Edison,* 301 N.W.2d at 835.

Second, PSI has repeatedly claimed, though it appears to have fallen on deaf ears, that it is seeking coverage only for the MDNR's soil contamination claim. PSI admits that the policy does not cover much of the parade of horribles used by both Wausau and Zurich, as well as by the district judge, *see* J.A. at 27 ("the MDNR alleges that it observed demolition of on-site structures, scattering of what appeared to be asbestos and a hose running from the lagoon to the nearby wetlands"). PSI goes so far as to state unequivocally that it seeks coverage only for the soil contamination. Zurich cannot rely on this strawman to support its motion.

The MDNR documents manifest two concerns. First, the MDNR was concerned about certain activities still underway at the facility, including dumping and storage practices. PSI concedes there is no coverage for these matters. Second, the MDNR was concerned with certain conditions, in particular the allegedly severe and long term damage done to the property by various toxins. The latter damage may be covered, to the extent that PSI can offer evidence that the damage stems from accidental spills occurring between 1951 and 1956. Therefore, the district court erroneously concluded that "[a] comparison of these [MDNR] allegations leaves no room for implication that the contamination and pollution at the Flat Rock site was accidental." The issue, properly framed, is whether PSI has offered more than a scintilla of evidence that some damage could be the result of spills that were accidents, occurring during the years in question.

The dispute between PSI and Zurich offers a textbook example of the normal course of a civil action of this type, at least until its conclusion. Having cross-claimed for declaratory judgment and joined Zurich as a third party, PSI was entitled to rest on its pleadings to the extent that they alleged a valid claim. Once discovery was under way, it was likely that motions for summary judgment would be made. At that point, PSI would have to take the next step. It would have to

move beyond the bare allegations of its pleadings and begin to develop facts of some substance sufficient to withstand, or support, summary judgment. A party in these circumstances develops facts relative to summary judgment to accomplish either of two objectives. First, it might seek to demonstrate that there are no disputed issues of fact and move for summary judgment itself. Or, alternatively, it may realize there is a disputed issue of fact and it may merely muster its evidence with an eye to surviving summary judgment. PSI initially tried to do the former, and, when confronted with Zurich's motion, made sure to do the latter.

Specifically, to demonstrate that it had at least created a factual dispute, PSI pointed to its sworn answers to discovery requests. These answers described "a series of discrete releases" from a condenser box and from certain leaking valves and pumps between 1951 and 1956.[1] (J.A. at 579–84). This evidence (which the district court ignored) is not overwhelming, and is not enough by itself to warrant summary judgment in favor of PSI because there is a dispute over the link between these spills and the current contamination. However, such evidence is more than a scintilla and is sufficient to meet PSI's burden at this point to defeat summary judgment. On remand, Zurich may be able to show that the releases were not accidental but deliberate or anticipated. *See United States Fidelity & Guaranty Co. v. Star Fire Coals, Inc.,* 856 F.2d 31 (6th Cir.1988); *Grant–Southern Iron & Metal Co. v. CNA Ins. Co.,* 905 F.2d 954 (6th Cir.1990).

This case is a far cry, for example, from our most recent examination of these issues in *Harrow.* In *Harrow,* insurance companies successfully executed the exact maneuver attempted by Zurich. In *Harrow,* however, the lack of evidence supporting the polluter's claim was patent. As we noted, "[d]iscovery revealed that, far from being 'sudden and accidental,' all the discharges of pollutants appear planned and intentional." *Harrow,* 64 F.3d at 1020. The evidence in favor of the

1. Contrary to Zurich's claim, PSI never denied that there had been any spills during the years in questions. To the contrary, PSI simply answered the relevant Interrogatories and Requests for Ad-

missions by stating that it did not know, because an investigation was ongoing. PSI subsequently provided sworn testimony detailing some leaks during the period in question.

party seeking defense and indemnification in *Harrow* amounted at most to a statement that there *may* have been accidental spills, and allegations that there were probably some, though none could be specified. *Ibid.* Here, however, PSI points to specific events alleged to be accidents.

Finally, Zurich appears to rely, implicitly at least, on the breadth of the pollution to support its claim that the pollution was certainly intentional and of long duration. However, we reiterate what PSI has maintained throughout the action, coverage is only sought for soil contamination. There is no per se rule that a large amount of contamination, spread over a long period of time, must result only from intentional spills, just as a court does not presume that a small amount of contamination is from an accidental spill. Therefore, the district court's decision to grant Zurich summary judgment on its claim that it had neither a duty to defend nor a duty to indemnify was erroneous.

### IV

PSI also claims that the district court improperly granted summary judgment to Wausau, *sua sponte*. Wausau admits that it never filed a motion for summary judgment. Nonetheless it argues that the district court's decision to enter summary judgment in its favor was appropriate. Wausau's argument is misguided.

▪ Wausau notes that it did not "formally" file a motion. However, it also did not informally file one. Wausau attempts to rely on the fact that it had "specifically requested the relief ultimately granted by the district court" in its memorandum in opposition to PSI's motion. *See* J.A. at 170 & 186–87 ("the facts of this case preclude entry of partial summary judgment in favor of PSI and dictate that Wausau is entitled to a declaration that it has no duty to defend PSI in the subject environmental matters"). Such conclusory statements offered at the beginning and end of a memorandum of law are clearly not a motion.

Federal Rule of Civil Procedure 7 provides:

**(b) Motions and Other Papers.**

(1) An application to the court for an order shall be by motion which, unless made during a hearing or trial, shall be made in writing, shall state with particularity the grounds therefor, and shall set forth the relief or order sought. The requirement of writing is fulfilled if the motion is stated in a written notice of the hearing of the motion.

. . . .

(3) All motions shall be signed in accordance with Rule 11.

The reasoning behind this rule is self-evident. It provides notice to the opposing party, to the judge, and to any other parties of the impending motion, allowing them to marshal evidence and prepare an appropriate response. Furthermore, it imposes the obligations of Federal Rule of Civil Procedure 11 on the parties. The line offered here cannot be seriously contended to amount to a motion, and Wausau does not vigorously advance the issue. Therefore, the question is whether the granting of summary judgment in this case, *sua sponte*, was appropriate.

▪ Wausau correctly notes that in certain limited circumstances a district court can enter summary judgment *sua sponte*. *Routman v. Automatic Data Processing, Inc.*, 873 F.2d 970, 971 (6th Cir.1989). *See Project Release v. Prevost*, 722 F.2d 960, 969 (2d Cir.1983); *see also* Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure: Civil 2d § 2720, at pp. 26–30 (1983). The most obvious example is a district court's decision to turn a motion to dismiss under Fed.R.Civ.P. 12(b)(6) into a motion for summary judgment by turning to materials outside the pleadings. Rule 12(b) clearly states:

If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, *and all parties shall be given reasonable opportunity to*

*present all material made pertinent to such a motion by Rule 56.*

Fed.R.Civ.P. 12(b)(6) (emphasis added). In a similar persuasive vein, the Supreme Court has held that "district courts are widely acknowledged to possess the power to enter summary judgments *sua sponte,* so long as the losing party *was on notice that she had to come forward with all of her evidence.*" *Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986) (emphasis added). Therefore, there is no per se prohibition on entering summary judgment, *sua sponte.*

Nonetheless, as Fed.R.Civ.P. 12 and *Catrett* demonstrate, a district court does not have sweeping authority to enter summary judgment at any time, without notice, against any party. We conclude that a district court's decision to impose summary judgment, *sua sponte,* and without notice, must be reviewed under two separate standards of review. The substance of the district court's decision must of course meet the normal standards for summary judgement. However, the procedural decision to enter summary judgment *sua sponte* must also be reviewed to determine if the court abused its discretion by entering the judgment on its own motion.

The latter principle reflects a common sense application of the law. Courts of Appeal are courts of review. It would normally be impossible to determine whether there is a disputed issue of material fact when a party has not had the chance to develop the record below. This would force an appeals court to serve as a sounding board for facts not properly in the record, simply because a party never had a chance to develop them. Similarly, as in this case, the court might be left to review the entire record for any disputed questions of fact or to weigh and examine facts never properly advanced below with regard to Wausau because PSI never thought Wausau was moving for anything, let alone complete relief.

Generally, before summary judgment can be granted against a party, Fed.R.Civ.P. 56(c) mandates that the party opposing summary judgment be afforded notice and reasonable opportunity to respond to all the issues to be considered by the court. *Routman,* 873 F.2d at 971. *See also Portland Retail Druggists Ass'n v. Kaiser Foundation Health Plan,* 662 F.2d 641, 645 (9th Cir.1981). Specifically, Rule 56(c) mandates that an adverse party be given ten days notice before summary judgment may be entered. Fed.R.Civ.P. 56(c) ("The motion shall be served at least 10 days before the time fixed for the hearing.") *See also Routman,* 873 F.2d at 971; *Beck v. Borden, Inc.,* 724 F.2d 44 (6th Cir.1984).

"Noncompliance with the time provision of the rule deprives the court of authority to grant summary judgment...." *Kistner v. Califano,* 579 F.2d 1004, 1005 (6th Cir.1978) (per curiam); *see also Routman,* 873 F.2d at 971. This court has specifically held that "where a district court is contemplating entering summary judgment against one of the parties, that party is entitled to unequivocal notice of the court's intentions." *Routman,* 873 F.2d at 972 (quoting *Yashon v. Gregory,* 737 F.2d 547, 552 (6th Cir.1984)).

We have stated previously that the granting of summary judgment *sua sponte* is "a practice we discourage." *Beaty v. United States,* 937 F.2d 288 (6th Cir.1991). This is particularly so when the court does not give advance notice of the potential action to the adversely affected party. Admittedly, this case is not as egregious an example as some. *See, e.g., Routman,* 873 F.2d 970, (district court limited subject of appellant's summary judgment motion and the discovery pursuant thereto, but then granted complete relief *sua sponte* to the opposing parties on issues it had forbidden the appellant to raise). Commentators have noted that there is a difference between simply granting summary judgment *sua sponte* and doing so in favor of an opposing party when one party has made a motion for summary judgment. In the latter case, the failure of the court to provide notice may not be as detrimental since the moving party is at least aware that the issue has been raised.

Here, the failure to allow PSI to present its facts in a coherent form has left PSI arguing stridently before this court that it does have sufficient facts to withstand sum-

mary judgment. In particular, PSI points to the evidence presented in its sworn discovery responses. These answers were ignored by the district judge, yet they clearly demonstrate a claim that some of the pollution was the result of various accidents, and would fall outside the pollution exclusion. In particular, the answers to Wausau's first set of Interrogatories (J.A. at 629–36) describe the structural failure of a storage tank in very cold weather, the overflow of a pumping truck, the failure of various pieces of equipment, and the opening of a valve by a vandal, each resulting in the release of oil. This evidence, if considered by the district court, may be sufficient to defeat summary judgment, although again there remains a dispute over whether these spills had any effect on the current situation. Had PSI been given notice that it needed to rebut the position adopted by the judge, it might very well have succeeded.

It is particularly relevant that there is a factual dispute presented by the documents over whether the pollution was regular and anticipated. As this court held in *United States Fidelity & Guaranty Co. v. Star Fire Coals, Inc.* 856 F.2d 31, 35 (6th Cir.1988), "pollution exclusion clauses apply to the release of wastes and pollutants taking place on a regular basis or in the ordinary course of business." When a pollution discharge occurs "on a regular ongoing basis over a [lengthy] period as a normal part of the [industrial] operation . . . it is impossible to characterize these discharges . . . as 'sudden' within the plain and obvious meaning of that term." On the other hand, as we held in *Grant–Southern Iron & Metal Co. v. CNA Ins. Co.*, 905 F.2d 954, 957 (6th Cir.1990), even when we "reject the argument that continuous and ongoing polluting can fall within the 'sudden and accidental' exception to the pollution exclusion, there [can remain] a genuine issue of fact" as to whether damage "may have been the result of a few discrete polluting events, each of which was short in duration and accidental in nature." As in *Grant–Southern,* where there is conflicting evidence on that issue, summary judgment would be inappropriate.

Therefore, we conclude that the decision to grant summary judgment to Wausau, *sua sponte,* without notice, and when PSI had only sought partial summary judgment, was an abuse of discretion, particularly where PSI has demonstrated a facially meritorious defense to the summary judgment motion.

## V

Finally, the insurers contend, as an alternative ground for affirmance, that an administrative action started by a PRP letter is not a "suit" under Michigan law, and thus cannot trigger any possible duty to defend and indemnify. The district court did not rule on this contention and we must disagree, as a matter of law. While this was the position adopted by this Circuit in *Ray Industries, Inc. v. Liberty Mut. Ins. Co.*, 974 F.2d 754 (6th Cir.1992), and was Sixth Circuit law when this case was argued, the Michigan Supreme Court has since made it clear that, under Michigan law, a formal suit in court is not required, and a PRP letter from the EPA is normally sufficient to trigger an insurer's duty to defend. *Michigan Millers Mut. Ins. Co. v. Bronson Plating Co.,* 445 Mich. 558, 519 N.W.2d 864 (1994). As we noted in *Harrow,* "the court relied heavily on the coercive powers granted to the EPA, particularly its ability to formulate and implement a remediation plan even without the cooperation of the polluter." *Harrow,* 64 F.3d at 1025 (citing *Bronson Plating,* 519 N.W.2d at 871–75). In its analysis, the Michigan Supreme Court also made it clear that it was not announcing a per se rule: "we wish to emphasize that this opinion should in no way be viewed as intimating that every request for relief should be considered the initiation of a suit that the insurers are obliged to defend. Rather, our determination on this issue is made primarily based on the unique aspects of CERCLA actions and the authority given the EPA under the statute." *Id.* 519 N.W.2d at 871 n. 13.

The Michigan Department of Natural Resources appears to have been the primary catalyst behind the investigation in this case. Whether an order coming solely from the state agency is sufficient has yet to be defini-

tively determined by Michigan courts. However, a review of the powers granted to the MDNR reveal that the agency has quite a significant arsenal of remedies at its disposal. For example, while conducting its investigation after sending a PRP letter, the MDNR is developing an administrative record. If a PRP does not cooperate, it severely hampers its opportunity to seek redress in a Michigan court, since judicial review is limited to the administrative record. M.C.L.A. § 299.616(5). Therefore, it would appear from a facial review that a PRP letter from the MDNR is quite analogous to a PRP letter from EPA. If this is the case, both Wausau and Zurich would owe PSI a duty to defend from the time the PRP letter was received, at least until all possible theories of coverage were disproven.

## VI

The judgment of the district court is **REVERSED.** The matter is **REMANDED** to the district court for proceedings consistent with this opinion.